1  BRIAN S. KABATECK,  SBN 152054
   (bsk@kbklawyers.com)
2  RICHARD L. KELLNER,  SBN 171416
   (rlk@kbklawyers.com)
3  ALFREDO TORRIJOS,  SBN 222458
   (at@kbklawyers.com)
4  KABATECK BROWN KELLNER LLP
   644 South Figueroa Street
5  Los Angeles, CA 90017
   Telephone: (213) 217-5000
6  Facsimile: (213) 217-5010

7  GREGORY E. KELLER (To be Admitted *Pro Hac Vice*)
   (gkeller@chitwoodlaw.com)
8  DARREN T. KAPLAN (Admitted *Pro Hac Vice*)
   (dkaplan@chitwoodlaw.com)
9  CHITWOOD HARLEY HARNES LLP
   2300 Promenade II
10 1230 Peachtree Street, N.E.
   Atlanta, Georgia 30309
11 Telephone:  (404) 873-3900
   Facsimile:  (404) 876-4476

12

13

14                **UNITED STATES DISTRICT COURT**

15               **NORTHERN DISTRICT OF CALIFORNIA**

16

| | |
|---|---|
| Chandra Sanders, Keith Yonai, and Bonnier Corporation, a Florida Corporation on Behalf of Herself and All Others Similarly Situated, | Case No.  5:08-CV-01713-JF |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| Apple, Inc., a California Corporation; and DOES 1 through 250, inclusive; | |
| Defendants. | |

24

25        Plaintiffs, Chandra Sanders, Keith Yonai and Bonnier Corp. (collectively,

26  "Plaintiffs"), individually and on behalf of the Class described below, by their attorneys,

27  make the following allegations based upon information and belief, except as to

28  allegations specifically pertaining to Plaintiffs and their counsel, which are based on

---

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

1   personal knowledge.  Plaintiffs bring this action for damages and injunctive relief against

2   Defendant, demanding trial by jury.

3

4   ## <u>NATURE OF THE ACTION</u>

5   1.      Plaintiffs bring this action against Apple, Inc. ("Apple") to recover

6   damages and other relieve available at law and equity on behalf of themselves as well as

7   on behalf of the members of the following class:

8   *All persons or entities located within the United States who*

9   *own a 20-inch Aluminum iMac.*

10  2.      Apple is a leading manufacturer of personal computers and consumer

11  electronics.  One of Apple's most successful products is a personal computer known as

12  the iMac, an "all-in-one" desktop computer that combines the monitor into the same case

13  as the CPU.   Since its introduction in 1998, the iMac product line has undergone

14  numerous revisions and updates.  These revisions have nearly always resulted in better,

15  faster and more capable iMacs usually at the same (or lower) price than the previous

16  iMac generation.

17  3.      The most recent version of the iMac (referred to herein as the "Aluminum

18  iMac") was released in August of 2007.  These new Aluminum iMacs are available in

19  two screen sizes: a model with a 20-inch active-matrix liquid crystal display (the "20-

20  inch Aluminum iMac") and a model with a 24-inch active-matrix liquid crystal display

21  (the "24-inch Aluminum iMac").  The 20-inch Aluminum iMac uses a Liquid Crystal

22  Display ("LCD") display that is significantly – as well as objectively – inferior to the

23  display used in the 24-inch Aluminum iMac.  Not only is the LCD display in the 20-inch

24  Aluminum iMac inferior to the display used in 24-inch Aluminum iMacs, but it also is

25  significantly inferior to the display used in the previous generation of 20-inch iMacs – the

26  same iMacs that the 20-inch Aluminum iMac replaced.

27  / / /

28

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

1    4.    The inferior display used in the 20-inch Aluminum iMac is cheaper to

2  manufacture, but those savings come at price.  Due to the nature of the display

3  technology used, the displays for the 20-inch Aluminum iMacs have a narrower viewing

4  angle, have less color depth, are able to display fewer colors, have less color accuracy

5  and are more susceptible to washout across the screen.

6    5.    Apple represents to consumers that the displays used in both the 20-inch

7  Aluminum iMacs and the 24-inch Aluminum iMacs are capable of representing:

8  "Millions of colors at all resolutions."  While the display technology used for the 24-inch

9  Aluminum iMacs is capable of representing "millions of colors," the inferior display

10  technology used in 20-inch iMacs is only capable of displaying 262,144 true colors, not

11  "millions of colors."

12    6.    This action arises from the fact that Apple failed to disclose that the LCD

13  display used in the 20-inch Aluminum iMac is inferior to the display used in the 24-inch

14  Aluminum iMac, is inferior to the display used in the previous generation of 20-inch

15  iMacs that it replaced, and is not capable of natively displaying "millions of colors."

16

17  ## THE PARTIES

18    7.    Plaintiff Chandra Sanders is a citizen of Texas who owns a 20-inch

19  Aluminum iMac.

20    8.    Keith Yonai is a citizen of South Carolina who purchased and owns a 20-

21  inch Aluminum iMac.

22    9.    Plaintiff Bonnier Corporation ("Bonnier") is a Florida corporation.

23  Bonnier's headquarters are located at 460 N. Orlando Avenue, Suite 200 Winter Park,

24  Florida 32789.

25    10.    Plaintiffs are informed and believe and thereon allege that defendant Apple,

26  Inc. ("Apple") is a California corporation doing business in the State of California.

27  Apple's corporate headquarters are located at One Infinite Loop, Cupertino, California

28

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

95014.

11.     Plaintiffs do not know the true names or capacities of the persons or entities sued herein as DOES 1 to 250, inclusive, and therefore sue such defendants by such fictitious names.  Plaintiffs are informed and believe and thereon allege that each of the DOE defendants is in some manner legally responsible for the damages suffered by plaintiff and the members of the class as alleged herein.  Plaintiffs will amend this complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction over the claims asserted herein individually and on behalf of the class pursuant to 28 U.S.C. section 1332, as amended in February 2005 by the Class Action Fairness Act.  Jurisdiction is proper because: (1) the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; (2) there is complete diversity of citizenship between Plaintiffs and Apple; and (3) a substantial number of the members of the proposed class are citizens of a state different from defendant Apple.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and (c) in that Apple resides in this district and a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of California.

## FACTUAL ALLEGATIONS

14.     Computers display digital images on monitors.

15.     Digital images consist of "pixels."  A pixel is the smallest part of a digitized picture.  When all of the pixels are displayed in the correct location, a correct image is displayed on the monitor.

16.     Each pixel is comprised of three "channels."  Each cannel corresponds to

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

one of the three main colors used to display digital images: red, blue, and green

17.    Each channel is comprised of a certain number of "bits."  A bit is the smallest measure of digital information.  A bit can take the value of either 0 or 1, or, in lay terms, "on" or "off."  When a certain color is displayed for a particular pixel, certain bits in each channel will either be displaying the color or not.  The particular combination of on and off bits in each channel results in the desired color for that pixel.

18.    The number of bits in each pixel determines the total number of colors a computer monitor can physically display, this is called color depth.  With a 6-bit monitor, each channel contains 6-bits, or 18-bits in total.  Each of these bits can be in one of two states, on or off.  For example, in the red channel, one potential variation is that all of the bits are in the on state.  A second variation is that bit 1 is off and the rest are on.  The result is that each channel is able to display $2^6$ variations.   Since there are three channels for each pixel, and each channel is able to display $2^6$ variations, the total number of colors a 6-bit monitor can display equals $2^6$ x $2^6$ x $2^6$, or 262,144.

19.    Higher quality monitors are able to display 8-bits per channel, or 24-bits in total.  The total number of colors an 8-bit monitor can display is equal to $2^8$ x $2^8$ x $2^8$, or 16,777,216.

20.    The higher the number of colors a monitor can display, the more accurate the on screen color will be to the "real life" colors digitally captured on the image. This color accuracy is especially important in photo and video editing.

21.    6-bit monitors attempt to compensate for their inherent inferiority though color simulation processes known as "dithering" and "frame rate control" (or "FRC"). The human brain can be "tricked" into seeing a particular color shade by using many almost identical shades. In a small display area, the brain will average all of the present colors creating the perception of the desired color shade.  For example, dithering is a process that uses a combination of adjacent pixels to produce the desired shade. Similarly, the FRC process displays alternating shades of colors close to the desired

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

1   shade onto a single pixel. When done at a high speed this creates the illusion of the

2   desired color shade.  While these processes are able to approximate the number of colors

3   possible on an 8-bit display, they are noticeable to many.

4         22.    Emulation of "true colors" via dithering or FRC can cause the appearance

5   of transverse stripes in smooth color gradients. Even worse, these techniques can

6   completely fail on specific pictures, which may result in flickering. Both of these

7   problems are particularly crippling when displays using this technology are used for

8   image and video editing,

9         23.    Because of its significant drawbacks, displays using dithering or FRC

10  technology are deemed by many to not be suitable for editing video or photos.

11        24.    Apple specifically markets its 20-inch aluminum iMacs for editing movies

12  and photos, promising "graphics, photos, and videos [that] come alive with richer colors

13  and deeper blacks."

14        25.    On August 7, 2007, Apple held a press event to announce the new

15  Aluminum iMacs.  At the event, Apple's CEO, Steve Jobs, trumpeted the new glossy

16  displays used in the Aluminum iMacs, stating: "Our customers have told us that they love

17  the new glossy displays."  As a video behind Mr. Jobs played showing an image on the

18  "old" iMac display slowly transforming into what it looked like on the new display, Mr.

19  Jobs stated: "These were the pre-glossy displays and we removed some coatings and

20  other things and give them their actual digital assets as they're meant to be seen.  For

21  photos, for movies they look *way better* on these glossy, beautiful, crisp displays."  Mr.

22  Jobs never revealed that a different, inferior, display technology was being used for the

23  20-inch Aluminum iMacs.  Nor did Mr. Jobs ever mention that the new 20-inch

24  Aluminum iMacs used an objectively inferior display technology than what was found in

25  the previous generation of 20-inch iMacs.

26        26.    A press release issued by Apple on August 7, 2007 begins with the

27  following sentence: "Apple today unveiled an all new all-in-one iMac line featuring

28

— 6 —

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

*gorgeous 20- and 24-inch widescreen displays*…." (Emphasis added.) The press release goes on to state: "The new iMac's 20- and 24-inch glossy widescreen displays provide incredibly crisp images, ideal for photos and movies…." Nowhere in the press release does Apple reveal that the 20-inch Aluminum iMac uses a significantly inferior display that the display found in the 24-inch Aluminum iMac. Nor does Apple reveal that the new 20-inch Aluminum iMacs used an objectively inferior display technology than what was found in the previous generation of 20-inch iMacs.

27.    Most modern computer monitors are liquid crystal displays ("LCD"). These often come in two types. One common type of LCD monitor is based on a technology known as twisted nematic film ("TN"). This is the least expensive type of LCD monitor. TN LCD monitors are only capable of 6-bit color. A second type of LCD monitor is in-plane switching ("IPS"). IPS LCD monitors are capable of 8-bit color.

28.    TN LCD monitors are more susceptible to "color washout," or a significant degradation of color accuracy. This is especially true when these screens are looked at an angle.

29.    The previous version of Apple's 20-inch iMac contained an 8-bit IPS monitor. This monitor was capable of natively displaying the full 16,777,216 colors. The 20-inch iMac Aluminum, unlike the previous 20-inch iMac and unlike the 24-inch iMac Aluminum which both used an IPS LCD monitor, uses a 6-bit TN monitor, capable of displaying only 262,144 colors.

30.    In its marketing materials, Apple describes the display of both the 24-inch and 20-inch iMac Aluminum models as though they were interchangeable, even though the monitors in each are of radically different technology.

31.    On its website, Apple states: "Whether you've got your eye on the 20-inch or breathtaking 24-inch iMac, you'll enjoy a wondrous widescreen performance from every seat in the house." Apple makes this representation without informing consumers that the 20-inch iMac Aluminum uses inferior display technology.

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No. 5:08-CV-01713-JF)**

32.     On its website, Apple states: "No matter what you like to do on your computer — watch movies, edit photos, play games, even just view a screen saver — it's going to look stunning on an iMac."  Apple makes this representation without informing consumers that the 20-inch iMac Aluminum uses inferior technology, which is particularly ill-suited to editing photographs because of the display's limited color potential and the distorting effect of the color simulation processes.

33.     On its website, Apple states: "Built-in 20-inch (viewable) or 24-inch (viewable) glossy widescreen TFT active-matrix liquid crystal display."  Apple makes this representation without informing consumers that the 20-inch iMac Aluminum uses inferior technology.

34.     On its website, Apple states: "Millions of colors at all resolutions."  Apple makes this representation without differentiating between the 20-inch and the 24-inch iMac Aluminum models.  As to the 20-inch model, this representation is false as the 20-inch iMac Aluminum's TN LCD monitor is only capable of displaying 262,144 true colors, not "millions of colors."

35.     Based on Apple's marketing statements, a reasonable consumer would have no reason to suspect that the 20-inch iMac Aluminum contained vastly inferior LCD technology from the 24-inch iMac Aluminum or the previous 20-inch iMac model.

36.     On or about December 25, 2007, Plaintiff Sanders received a 20-inch Aluminum iMac as a Christmas present from a relative.

37.     Between January and March 2008, Plaintiff Bonnier purchased 16, 20-inch aluminum iMacs for various departments in its magazine publishing business.  Plaintiff Bonnier purchased these computers through PC Connections, a third-party vendor.

38.     Plaintiff Bonnier purchased these computers based on its positive experience and satisfaction with the two previous generations of iMacs that it owned.

39.     Plaintiff Bonnier's employees complained about the inferior quality of the new iMac screen after noticing, among other things, color-shifting on different parts of

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

the screen.

40.    On, August 13, 2007 (less than a week after the computers first went on sale) Plaintiff Yonai purchased a 20-inch Aluminum iMac on the online Apple Store for his graphics designs business.

41.    Plaintiff Yonai purchased this computer based on the information presented by the Defendant Apple on its website and the recommendations by friends in the graphics arts industry who owned previous generation iMacs.   Plaintiff Yonai held off his purchase for a new iMac for months because of rumors that a new, better generation would soon be released.

42.    Plaintiff Yonai noticed color-shifting on the screen when working with the computer causing problems with his graphics work.

## CLASS ACTION ALLEGATIONS

43.    Description of the Class: Plaintiffs bring this nationwide class action on behalf of themselves and a Class defined as follows:

> *All persons or entities located within the United States who*
> *own a 20-inch Aluminum iMac.*

44.    Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns.  Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

45.    Plaintiffs and the Class bring this action for equitable, injunctive and declaratory relief pursuant to subdivisions (b)(1), (b)(2) and (b)(3) of rule 23 of the Federal Rules of Civil Procedure.

46.    Numerosity:  The proposed Class is so numerous that individual joinder of all its members is impracticable.  Due to the nature of the trade and commerce involved,

— 9 —

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

however, Plaintiffs believe that the total number of Class members is at least in the tens

of thousands and members of the class are so numerous and geographically dispersed

across the United States.  While the exact number and identities of the Class members are

unknown at this time, such information can be ascertained through appropriate

investigation and discovery. The disposition of the claims of the Class members in a

single class action will provide substantial benefits to all parties and to the Court.

47.    Common Questions of Law and Fact Predominate:  There are many

questions of law and fact common to the representative Plaintiffs and the Class, and those

questions substantially predominate over any questions that may affect individual Class

members.  Common questions of fact and law include, but are not limited to, the

following:

a.    Whether Apple has failed to disclose to consumers the material fact

that the 20-inch iMac Aluminum, marketed as though indistinguishable from the

24-inch iMac Aluminum, contains a 6-bit TN LCD monitor;

b.    Whether or not Plaintiffs and the members of the Class have been

damaged by the wrongs complained of herein, and if so, the measure of those

damages and the nature and extent of other relief that should be afforded;

c.    Whether Apple engaged in unfair, unlawful and/or fraudulent

business practices;

d.    Whether Apple failed to disclose material facts about the 20-inch

iMac Aluminum;

e.    Whether Apple's statement that the 20-inch iMac Aluminum was

capable of "millions of colors" created an express warranty and whether Apple

breached that warranty; and

f.    Whether Apple was unjustly enriched through the wrongs

complained of herein.

48.    Typicality:  Plaintiffs' claims are typical of the claims of the members of

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

the class.  Plaintiff and all members of the class have been similarly affected by Defendant's common course of conduct since their iMac computers acted in exactly same way.

49.    Adequacy of Representation:   Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have retained counsel with substantial experience in prosecuting complex and class action litigation.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.  Neither Plaintiffs nor her counsel have any interests adverse to those of the Class.

50.    Superiority of a Class Action:   Plaintiffs and the members of the Class suffered, and will continue to suffer, harm as a result of Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.   Individual joinder of all members of the class is impractical. Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendant's common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the class member. Furthermore, for many, if not most, class members, a class action is the only feasible mechanism that allows therein an opportunity for legal redress and justice.

51.    Adjudication of individual class members' claims with respect to the Defendant would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication, and could substantially impair or impede the ability of other class members to protect their interests.

— 11 —

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

# FIRST CAUSE OF ACTION

## Fraudulent Concealment

52.    Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

53.    Apple knew at all material times that its 20-inch iMac Aluminum contained a 6-bit TN LCD monitor, and LCD monitor of inferior technology capable of displaying only 262,144 true colors, yet marketed the 20-inch iMac Aluminum as having a monitor indistinguishable from that of the superior one used in the 24-inch iMac Aluminum.

54.    These facts were not known to Plaintiffs and the Class.

55.    Apple had a duty to disclose the above known material facts because Apple knew that these material facts were unknown to Plaintiffs and the Class, because Apple was in a superior position of knowledge with regard to its own technology, and because Apple chose to make certain representations that presented only a part of the true story and misled consumers about the subject products.

56.    Apple's knowledge that 20-inch iMac Aluminum contained an inferior TN LCD monitor, combined with Apple's knowledge that Plaintiffs and the Class reasonably relied upon Apple to communicate the true state of facts relating to its iMac Aluminum, creates a legal obligation on Apple's part to disclose to Plaintiffs and the Class that its 20-inch iMac Aluminum contained an inferior TN LCD monitor.

57.    Plaintiffs and the Class were unaware of the above facts and would not have acted as they did if they had known of the concealed material facts.

58.    Apple intentionally concealed and/or suppressed the above facts with the intent to defraud Plaintiffs and the Class.

59.    Apple's concealment of the above facts has caused damage to Plaintiffs and the Class in an amount to be shown at trial.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

## SECOND CAUSE OF ACTION

### Violation of California Business and Professions Code §17200 et. seq.

60.    Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

61.    Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury in fact and has lost money or property as a result of Apple's actions as delineated herein.

62.    Apple's actions as alleged in this complaint constitute an unfair or deceptive practice within the meaning of California Business and Professions Code section 17200 in that Apple's actions are unfair, unlawful and fraudulent, and because Apple has made unfair, deceptive, untrue or misleading statements in advertising media, including the Internet, within the meaning of California Business and Professions Code sections 17500, et seq.

63.    Apple's business practices, as alleged herein, are unfair because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers in that consumers are not informed that Apple's 20-inch iMac Aluminum contains an inferior TN LCD monitor.

64.    Apple's business practices, as alleged herein, are unlawful because the conduct constitutes false marketing and advertising, as well as the other causes of action herein alleged.

65.    The practices are fraudulent because they are likely to deceive consumers into believing that that their 20-inch iMac Aluminum contained the same high quality LCD monitor as the 24-ich iMac Aluminum when, in fact, it does not.

66.    Apple's alleged wrongful business acts constituted, and constitute, a continuing course of conduct of unfair competition since Apple is marketing and selling their products in a manner that is likely to deceive the public.

67.    Apple's business acts and practices, as alleged herein, have caused injury to

— 13 —

1    Plaintiffs and the Class.

2        68.    Pursuant to section 17203 of the California Business and Professions Code,

3    Plaintiffs and the Class seek an order of this court enjoining Apple from continuing to

4    engage in unlawful, unfair, or deceptive business practices and any other act prohibited

5    by law, including those acts set forth in the complaint.  Plaintiffs and the Class also seek

6    an order requiring Apple to make full restitution of all moneys it wrongfully obtained

7    from Plaintiffs and the Class.

8        WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

9                    **THIRD CAUSE OF ACTION**

10                   **Breach of Express Warranty**

11        69.    Plaintiffs reallege the preceding paragraphs as if fully set forth herein and,

12    to the extent necessary, pleads this cause of action in the alternative.

13        70.    There is an express warranty between Apple as the manufacturer and

14    Plaintiffs and the Class.  The express warranty was created by Apple's affirmations in its

15    promotional materials that 20-inch iMac Aluminum was capable of displaying "millions

16    of colors."  These statements were made by the seller prior to and at the time of sale, for

17    the purpose of assuring the buyer of the truth of the facts affirmed.

18        71.    The failure of Apple's 20-inch iMac Aluminum to natively display

19    "millions of colors" is a breach of the express warranty upon which Plaintiffs and the

20    class reasonably relied and which proximately caused plaintiffs' and the class' injury

21        72.    Timely notice of the breach to Apple is not required because this is an

22    action against a manufacturer on a warranty that arises independently of a contract of

23    sale.

24        WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

25    / / /

26    / / /

27    / / /

28

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

# FOURTH CAUSE OF ACTION

## Unjust Enrichment

73.    Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

74.    Apple has received money belonging to Plaintiffs and the Class through the sale of 20-inch iMac Aluminum marketed as capable of displaying "millions of colors" and as having an LCD monitor that is of the same quality of that in the 24-inch iMac Aluminum when in fact the displays are only capable of displaying 262,144 colors and employ a technology that is demonstrably lesser quality than the technology employed by the 24-inch iMac display.

75.    As a direct and proximate result of Apple's misconduct as set forth above, Apple has been enriched at the expense Plaintiffs and the Class.

76.    Under principles of equity and good conscience, Apple should not be permitted to keep the full amount of funds it received from Plaintiffs and the Class's purchase of Apple's 20-inch iMac Aluminum.

77.    Apple should make restitution to Plaintiffs and the Class.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Class request that the Court enter an order or judgment against the Defendant as follows:

1.    Certification of the proposed class and notice thereto to be paid by Defendant;

2.    Adjudge and decree that Defendant has engaged in the conduct alleged herein;

3.    For restitution and disgorgement on certain causes of action;

4.    For an injunction ordering Defendant to cease and desist from engaging in

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

1    the unfair, unlawful, and/or fraudulent practices alleged in the Complaint;

2        5.      For compensatory and general damages according to proof on certain

3    causes of action;

4        6.      For special damages according to proof on certain causes of action;

5        7.      For both pre and post-judgment interest at the maximum allowable rate on

6    any amounts awarded;

7        8.      Costs of the proceedings herein;

8        9.      Reasonable attorneys fees as allowed by statute; and

9        10.     Any and all such other and further relief that this Court may deem just and

10   proper.

11

12   DATED:  August 7, 2008              **KABATECK BROWN KELLNER LLP**

13

14                                      By _____/s/_____
                                            Brian S. Kabateck
15                                          Richard L. Kellner
                                            Alfredo Torrijos
16                                          *Counsel for Plaintiffs and the class*

17                                      **CHITWOOD HARLEY HARNES LLP**
                                        Gregory E. Keller (To be Admitted *Pro Hac Vice*)
18                                      Darren T. Kaplan (To be Admitted *Pro Hac Vice*)
                                        *Counsel for Plaintiffs and the class*
19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT**
**(Case No.  5:08-CV-01713-JF)**

1

**DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand a trial by jury in the instant action.

3

4

DATED:  August 7, 2008              **KABATECK BROWN KELLNER LLP**

5

6

By _____/s/_____

7

Brian S. Kabateck
Richard L. Kellner
Alfredo Torrijos

8

*Counsel for Plaintiffs and the class*

9

**CHITWOOD HARLEY HARNES LLP**

10

Gregory E. Keller (To be Admitted *Pro Hac Vice*)
Darren T. Kaplan (To be Admitted *Pro Hac Vice*)

11

*Counsel for Plaintiffs and the class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT
(Case No.  5:08-CV-01713-JF)**

## CERTIFICATION OF SERVICE

I, Alfredo Torrijos, hereby certify that on August 7, 2008, I caused the foregoing document titled **FIRST AMENDED CLASS ACTION COMPLAINT** to be electronically filed and served upon the persons named below via the ECF system.

This document is available for review and downloading from the EFC system.

LUANNE SACKS
 (luanne.sacks@dlapiper.com)
DLA PIPER US LLP
153 Townsend Street, Suite 800
San Francisco, CA  94107-1957
Tel: (415) 836-2500
Fax: (415) 836-2501

MARK H. HAMER
 (mark.hamer@dlapiper.com)
DAVID A. KNOTTS
 (david.knotts@dlapiper.com)
DLA PIPER US LLP
401 B Street, Suite 1700
San Diego, CA  92101-4297
Tel: (619) 699-2700
Fax: (619) 699-2701
*Attorneys for Defendant*
*Apple Inc.*


Dated: August 7, 2008                    By: _____/s/_____

                                             Alfredo Torrijos